## Peffer v. Pennsylvania Water Company, Appellant.

*Water companies—Impure water—Equity.*

Where on a bill in equity against a water company it is made to appear that the water furnished by the company was impure and polluted, contained bacteria and bacilli, and was the cause of typhoid fever, the court will enter a decree directing the company to secure and provide a sufficient supply of pure and wholesome water, and further decree that the company shall file a statement within a time specified showing what it proposes to do to comply with the provisions of the Acts of April 29, 1874, P. L. 73, June 2, 1887, P. L. 310, and May 16, 1889, P. L. 226.

In a proceeding to compel a water company to furnish pure water, the company is not required to furnish chemically pure water. It must furnish water that shall be ordinarily and reasonably pure and wholesome.

Ordinarily pure and wholesome water means such as is reasonably clean from dirt, discoloration and odor, reasonably free from bacteria and coli or any other infection or contamination which renders the water unfit for domestic use and unsafe and dangerous to individuals.

Argued May 12, 1908. Appeal, No. 8, Oct. T., 1908, by defendant, from decree of C. P. No. 3, Allegheny Co., Aug. T., 1906, No. 398, on bill in equity in case of E. Z. Peffer et al. v. Pennsylvania Water Company. Before FELL, BROWN, MESTREZAT, POTTER and ELKIN, JJ. Affirmed.

Bill in equity for an injunction.

MILLER, P. J., specially presiding, filed the following opinion :

The bill, by three citizens of the borough of Wilkinsburg, alleges that the defendant company is not furnishing reasonably pure and wholesome water to them and to defendant's consumers, as it is required to do by virtue of its incorporation.

### FINDINGS OF FACT.

1. The Pennsylvania Water Company, defendant, was char-

tered in 1887, under the provisions of the act of 1874, for the purpose of supplying water to the inhabitants of the then township of Sterrett, in the county of Allegheny.

By various mergers and consolidations, on May 26, 1902, a number of other water companies were included under the name of the defendant company; as such it is now authorized by charter to supply water to the public in the Thirty-seventh and Forty-first wards of the city of Pittsburg, in the boroughs of Wilkinsburg, Edgewood, Swissvale, North Braddock, East Pittsburg, Turtle Creek, Wilmerding, Pitcairn, and in the townships of Penn, Wilkins, Braddock, North Versailles and Patton.

2. The source of supply of the water furnished by the defendant company is the Allegheny river, which is the most available to furnish an adequate quantity to supply the needs of the defendant company and those of the inhabitants in the districts so supplied.

This river is also the source of supply for the public municipalities of the cities of Pittsburg and Allegheny, taken from the river in the near vicinity of defendant's intake pipes.

3. The pumping station of the defendant company is located in Penn township, on the south side of the Allegheny river, at Nadine station on the Allegheny Valley Railway, a short distance east of the Pittsburg city line. From the time of its incorporation to 1897, the defendant company furnished unfiltered river water to its patrons.

4. In the year 1896 it constructed, and put in operation in the year 1897, a crib in the Allegheny river, which was constructed primarily as follows:

A large structure was built thirty-two feet wide, 308 feet long and five feet deep, made of 2″x6″ and 2″x8″ planks placed edgewise and flatwise respectively, and separated by intervals of about two inches, so as to form a thick wooden grating, setting or forming a rectangular crib or box with an open bottom. A suitable excavation was dredged in the bed of the river to the depth of about ten feet. This excavation is located on the northerly side of the river, about 300 feet from the north shore and about 600 feet from the south shore. The bed of the Allegheny river in this locality for a depth of at least thirty feet is composed of sand and gravel. The crib

was sunk to the bottom of the excavation. The surrounding excavation was then filled, and the crib covered to a depth of about one foot with coarse gravel two inches in size; the balance of the excavation was covered with sand and fine gravel such as had passed through a one and a half inch screen to a depth of about four feet, until the excavation was filled even with the ordinary surface of the bed of the river. The depth of the water over the crib ranges ordinarily from eight to ten feet. From the hollow chamber constituting the interior of the crib a twenty-four inch pipe line was constructed across the river, buried under the bed thereof to the defendant company's pumping station at Nadine.

Beginning with the year 1897, the defendant company furnished to its patrons water drawn from the interior of the crib above described, and which is referred to in the testimony as crib No. 1. The water so furnished was pumped to the defendant's reservoir in Penn township, and thence distributed by mains.

The gravel bed in which said crib is sunk or located is highly permeable and filled with water, partly ground water and partly river water which percolates through said cribs, the water furnished from the crib by the defendant company partly permeating through said gravel beds from the bottom and sides of the crib, and partly river water permeating the bed of sand and gravel covering the top of the crib.

5. In 1901, owing to the growth of the territory which the company supplied, and anticipating additional demands of the Turtle Creek Valley, the company constructed and placed in operation in the year 1902 two additional cribs in the bed of the Allegheny river, lying to the north or up stream from crib No. 1, and which are referred to in the testimony as cribs Nos. 2 and 3; these were constructed substantially in the same manner as the former, except that the interstices between the timbers on top of the cribs were constructed one inch wide; these are forty-eight feet wide, 480 feet long, five feet deep; they were sunk in the excavations which had been prepared for them, parallel with each other and ten feet apart; these excavations and the tops of the cribs were covered to a depth of about twelve inches with large stone and gravel two inches or more in size, and the whole covered to a depth of about five

feet with sand and gravel which had passed through a one inch mesh. A main line of cast iron pipe, ranging from twenty-four inches to forty-two inches in diameter, is laid in the ten feet space excavated between cribs Nos. 2 and 3, with short branches extending at intervals into the interior of both of said cribs; this main line of forty-two inch pipe so contained in the trench subsequently filled, crosses the river to the defendant's pumping station at Nadine.

The river bed in which these latter cribs are located is of the same character as that described surrounding crib No. 1, and the water flowing from the interior thereof is of the same general character as that in No. 1. This water is a great improvement over the raw unfiltered river water, yet it is at times muddy, turbid and odorous, and is not free from impurities, detrimental to comfort and injurious to health.

The condition of these cribs and pipes and the covering over them, can only be ascertained by soundings and by divers; they are hard to repair and keep in order, difficult of examination, and, in the light of modern development, they are unique and antiquated.

6. During part of the winter of 1905, 1906, and the spring and early summer of 1906, down to the month of June, 1906, the forty-two inch main leading from cribs Nos. 2 and 3, crossing the Allegheny river to the pumping station, had become displaced at one joint and open on the lower side about four inches; through this opening unfiltered water so entered the pipe and then to the reservoir and mains of the defendant. In the year 1904 the manhole cover near the pumping house was twice carried away by ice, on each occasion allowing raw water to get into the pipes; in the summer of 1906 a manhole cover near crib No. 1 became broken and displaced, allowing raw water to enter the mains. With reasonable promptness these defects were remedied; during their existence the purity of the water was more seriously affected; it was more turbid and contained a higher percentage of bacteria and coli. Holes or excavations have also been found on the surface of these cribs, which has impaired their efficiency.

7. For the purpose of increasing the capacity of these cribs a process of scouring or changing the surface of the river bed covering the cribs is in practice; this is done by means of a

heavy iron rake, weighing 400 pounds, three feet long, having seven teeth each fifteen inches long and an inch in diameter; these teeth contain each three holes three-sixteenths of an inch in diameter, two in front and one in the bottom; the cross-bar of the rake, which is hollow, is connected with a two-inch hose through which water is forced with a pressure of 125 pounds per square inch. This rake so equipped, with the water forced through the ends thereof, is dragged over the surface of the crib to stir up the silt or covering. It is moved by hand, the rope to which it is attached being wound by windlass connected with barges. The hose action and water pressure is furnished from a boiler and pump in a boat moved along the line of the barges from south to north.

Cribs Nos. 2 and 3 are thus scoured together, while No. 1 is separate. The rake moved over the same surface three times in succession before a new area is worked.

In 1905 this work began in May and ended in November; in 1906 it began in May and ended in December, and was continued except as interfered with by the state of the weather or the stage of the river; approximately the same time was occupied in the year prior thereto.

While this process of raking or scouring is going on the cribs are in constant use, water is continually taken therefrom and pumped into the reservoir and distributed through the defendant's company's mains. The disturbance of the surface of the cribs and the destruction of the silt formation thereon permits a large increased volume of raw river water to pass into the interior of the crib, with less hindrance and consequently less efficient filtering. It is during and immediately after these periods of scouring that the deleterious character of the water is more apparent and more easily ascertainable.

8. The water shed draining into the Allegheny river at this point covers about 12,000 square miles. It extends east as far as Johnstown on the Conemaugh river, and north beyond Oil City on the Allegheny river, and includes a large number of towns and a thickly populated district. A short distance above these cribs the sewage from the Allegheny county workhouse and the Allegheny city poor farm empties into the Allegheny river with a volume of 188 gallons per minute; at Oakmont, two and a half miles above, 107 gallons of

sewage per minute; at Verona, still nearer the defendant's cribs, with sewage of 220 gallons per minute.

Taking into consideration the extent of the watershed, the territory draining into the Allegheny river, the sewage from towns, villages, cities, public institutions, and the presence of bacteria and coli in the analysis of the raw Allegheny river water, compels the finding as a fact that at the place in question, to wit: the cribs of the defendant company, the Allegheny river is a highly polluted stream.

9. In 1905 and 1906, typhoid fever, which was prevalent since 1902 in the borough of Wilkinsburg, became an epidemic; it also prevailed to a great extent in the Thirty-seventh ward, Pittsburg, and in Swissvale borough, supplied by the defendant company, the percentage of cases and the death rate being higher per thousand capita in Wilkinsburg than anywhere else in the United States; these typhoid cases were generally distributed throughout the two boroughs and the ward above referred to.

10. While modern scientific opinion is that typhoid fever may be caused and spread by vegetables, milk, infection, etc., a careful consideration of the large mass of expert testimony given by the witnesses on both sides in this case justifies the finding as a fact that impure, polluted water, containing bacteria and the colon bacilli, is a prevailing cause of this pestilence.

11. From the great number of bacterial analyses made by the various experts for both the plaintiffs and the defendant, it appears that bacteria in large numbers exist in the raw Allegheny river water, averaging many thousand per cubic centimeter. It also appears that the quantity of bacteria found in this water after it passes through the filter cribs of the defendant company is very materially reduced when the cribs, pipes and coverings were in perfect condition, and when the scouring process was not going on.

These analyses also show the presence of colon bacilli in proportionately large quantities in the raw Allegheny river water; their presence is very materially reduced after the water has passed through the filter cribs when they were properly used, in proper repair, and the scouring process was not in operation, but both bacteria and the colon bacilli in

dangerous quantities are found in defendant's water after it has passed from the filter cribs.

12. From all the testimony, taking into account the source and character of supply, the effect and amount of contamination and pollution, the presence of bacteria and coli, its turbidity and odor, the prevalence of typhoid fever, the method of increasing the supply while lessening the efficiency of the filter process, the accidents which have occurred since the cribs have been in operation, the inability of the defendant company to continuously examine and repair these cribs, the fact is found that the water furnished by the defendant company is not reasonably pure and wholesome, and that without a change and improvement of its present filtration processes, it cannot furnish reasonably pure and wholesome water.

13. To construct a new slow sand filtration plant on the bank of the Allegheny river of sufficient capacity to supply the present requirements of the defendant, would require an expenditure of possibly $750,000, the abandonment of the present cribs and an increased cost for operating expenses. A fair capitalization charge for interest, depreciation, etc., would be eight per cent on the cost of the new construction. The defendant company uses at present about 8,000,000 gallons of water per day; the Pennsylvania Railroad Company now being no longer a customer, necessarily the defendant company would have to increase its charges, otherwise it would not be able to secure a fair return for such an increased investment; this, however, is subject to modification for the reason that $750,000 of common stock is outstanding for which no money has been paid, and the franchises of the company are of large value, neither of which are taken into account in the foregoing estimate.

14. If the defendant company constructed an additional crib or cribs, of the character of those described as cribs Nos. 2 and 3, so as to be able to have not only the larger filter surface, but to be able to cease the use of one or more while the necessary scouring or repairing process is going on, keeping the others in proper condition, maintaining at the same time efficient supervision over the cribs and pipes in use, the water so distributed to its customers would be far less objectionable, dangerous, impure and unwholesome. This construction of an

additional crib or cribs is comparatively of small cost as compared with the construction of an entire new slow sand modern filtration plant, ot a new mechanical filtration plant.

### CONCLUSIONS OF LAW.

1. The fact having been found that the water complained of, as furnished by the defendant, is not reasonably pure and wholesome, it follows that the plaintiffs' bill must be sustained.

2. An interlocutory decree will be entered, directing it to secure and provide a sufficient supply of pure and wholesome water; further directing that it shall within three months from the date of decree file a statement of the steps it has taken and proposes to take in compliance with the requirements to furnish reasonably pure and wholesome water, upon the submission of which the plaintiffs may file a reply or answer, as they may deem advisable. It will further be decreed that this case be retained for such further proceedings as may be necessary to insure its performance, and to enable the court to exercise the jurisdiction conferred by the act of assembly under which this action is brought, with liberty on the part of either of the parties to apply to court for furtner orders and decrees as may be necessary and just.

3. Defendant to pay the costs.

### OPINION.

A careful consideration of the voluminous testimony covering about 1,100 typewritten pages, given by a large number of witnesses, including physicians, chemists, engineers and eminent filtration experts from many sections of this country, has compelled the conclusion reached as to the character of the water furnished by the defendant company and requires compliance with the interlocutory decree to be made.

It is not necessary at this stage of the proceeding to enter into an extended discussion of the case. It may be taken as settled at the outstart that chemically pure water is not the standard. The definition of the water required, that it shall be ordinarily and reasonably pure and wholesome, controls in the cases of Brymer v. Butler Water Company, 172 Pa. 489 ; Brace Brothers v. Pennsylvania Water Company, 7 Pa. Dist. Rep. 71 ; Hinkson et al. v. The New Chester Water Company,

8 Del. County Rep. 417. Ordinarily pure and wholesome water necessarily means such as is reasonably clean from dirt, discoloration and odor, reasonably free from bacteria and coli, or any other infection or contamination which renders the water unfit for domestic use and unsafe and dangerous to individuals. Modern investigation and scientific attainments demonstrate that water from polluted sources can by proper filtration be made reasonably safe and pure, and therefore the standard of purity as fixed by the well-recognized authorities must be secured.

It is not for the court at this time to define what the defendant company shall do in the way of construction of new plants or improvement of the present one. It is estimated in the findings of fact that most objectionable features connected with the present filter cribs is their inaccessibility, the danger of accident from causes not easily ascertained or repaired, and the method taken of increasing the supply by destroying the efficiency of the filtration process, and use of water at the same time. This might be overcome by the construction of additional cribs, putting out of use those that are undergoing the process of disturbance in scouring, and might be aided by more continuous investigation, through divers, of their constant condition; it might be that with the decrease in the demand from the defendant company by reason of the withdrawal of the Pennsylvania Railroad Company's supply, that the same results can be obtained from the present cribs if the foregoing objections are avoided; these are, however, mere suggestions arising out of the testimony.

Undoubtedly these cribs have done meritorious work in the past; at the time they were constructed nothing like them was known to exist; they were in advance of the times then, and the company may be able by the same means to improve the character of the supply now.

The circumstances do not warrant harsh or oppressive burdens to be laid upon defendant at once; it can improve the character of its water supply; but in requiring this to be done regard will be had to the fact that it is entitled to fair consideration, and that those who are interested in it are entitled to fair return from their investment. It is for this reason that ample time will be given in which to formulate plans for its

improvements, and submit the same to the court, and ample time will be given for the purpose of putting the same into effect.

### DECREE.

And now, September 28, 1907, this cause having been heard by the court on evidence offered by the respective parties, and argument of counsel, and the findings of fact, conclusions of law and opinion of the court filed, and exceptions thereto, it is ordered, adjudged and decreed, as follows :

That the Pennsylvania Water Company, the defendant, having refused and neglected to furnish the plaintiffs and its patrons with a sufficient supply of reasonably pure and wholesome water, the defendant company secure and provide, and at all times hereafter furnish to the plaintiffs and its other patrons, either by change of its source of supply, by proper filtration, or by some other proper method, a sufficient supply of water, so free from sewage and organic matter, turbidity and odor as to make said water reasonably pure and wholesome.

Within three months from the date of this decree, the defendant shall file in this cause a statement of the steps it has taken, and which it proposes to take in further compliance with the provisions of this decree, and of the acts of April 29, 1874, June 2, 1887, and May 16, 1889, and that upon filing the said statement, the plaintiffs may file in this cause such statement, suggestion or answer as they may deem advisable.

That this case be retained in court for such further proceedings as from time to time may be necessary and proper to insure the performance of this decree, and to enable the court to exercise the jurisdiction conferred by the said act of April 29, 1874, and with the liberty on the part of either party at any time, to apply to the court for such orders and further decrees as may from time to time be necessary and just.

The costs in this case to be paid by the defendant.

*Error assigned* was the decree of the court.

*G. B. Gordon,* of *Gordon & Smith,* with him *Geo. W. Herriott* and *A. W. Duff,* for appellant.

*R. A. Balph,* with him *J. A. Langfitt,* of *Langfitt & Mc-Intosh,* for appellees.

Per Curiam, May 25, 1908 :

The decree entered in this case is affirmed on the opinion of Judge Miller.